IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

RECEIVED
USDC CLERK, CHARLESTON, SC

2007 AUG 31  P 12: 27

| | |
|---|---|
| Wesley Edward Smith,     ) | C. A. No. 2:06-0040-DCN-RSC |
|     ) | |
|     Plaintiff,     ) | |
|     ) | |
|     -versus-     ) | **O R D E R** |
|     ) | |
| Pepsi Bottling Group (PBG),     ) | |
|     ) | |
|     Defendant.     ) | |

This employment discrimination case is before the undersigned United States Magistrate Judge for consideration of cross motions for summary judgment and entry of an order on consent of the parties and reference by a United States District Judge.  28 U.S.C. § 636(c).

On January 4, 2006, the plaintiff, Wesley Smith, who is black, sued the Pepsi Bottling Group (PBG) and Lynn S. Holley, the Senior Director and General Counsel for the Pepsi Bottling Group (PBG), and alleged that he was terminated by PBG because of racial discrimination in violation of Title VII of the Civil Rights Act of 1964, breach of contract, and breach of the covenant of good faith and fair dealing.  Smith also alleged that the Uniform Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. § 4301 et seq., was violated and that he is entitled to unspecified benefits under Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461.  Holley was

1

dismissed from the action on April 26, 2006, by consent of the parties.

PBG answered on March 6, 2006, and on October 13, 2006, filed an amended answer with counterclaims of conversion, abuse of process, and fraud in the judicial process. The counterclaims were brought after Smith deposed that he took property of PBG without PBG's permission. PBG filed a motion for summary judgment on October 18, 2006, as did Smith. On October 26, 2006, Smith was provided a copy of the motion and was given an explanation of dismissal and summary judgment procedure as well as pertinent extracts from Rules 12 and 56 of the Federal Rules of Civil Procedure similar to that required by Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975). On October 31, 2006, PBG's motion was denied with leave to refile upon the completion of discovery.

Thereafter, on October 31, 2006, PBG's motion was denied with leave to refile upon the expiration of an extended discovery period. On January 30, 2007, Smith filed an affidavit is support of his summary judgment motion. On March 1, 2007, PBG opposed Smith's summary judgment motion. On March 1, 2007, PBG refiled its motion for summary judgment and on March 2, 2007, Smith was provided another Roseboro order. A supplemental motion for summary judgment by PBG was filed on March 16, 2007, in which it sought judgment on its counterclaims. Another Roseboro order was

2

provided to Smith on March 27, 2007. Smith opposed PBG's supplemental motion for summary judgment on March 28, 2007, and filed a supplemental motion for summary judgment. PBG filed a reply on April 26, 2007, as did Smith on April 30, 2007. Hence, it appears consideration of the summary judgment motions is appropriate.

## SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court first must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. Celotex Corp. v. Cattrett, 477 U.S. 317 (1986). All evidence should be viewed in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-23 (4th Cir. 1990). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "[W]here the record taken as a whole

3

could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." Teamsters Joint Council No. 83 v. CenTra, Inc., 947 F.2d 115, 119 (4th Cir. 1991); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  Unsupported speculation is not enough to withstand a motion for summary judgment.  Ash v. United Parcel Service, Inc., 800 F.2d 409, 411-12 (4th Cir. 1986).  Indeed, the court should draw reasonable inferences on behalf of the non-moving party, but it must not slip into "sheer speculation." The court may not move beyond inference and into the realm of mere conjecture.  Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 242 (4th Cir. 1982).

FACTS

The facts either undisputed or as presented by the plaintiff, with all reasonable inferences drawn in favor of the plaintiff as the nonmoving party, to the extent supported by the record, are as follow.

Defendant PBG manufactures, sells, and distributes Pepsi-Cola beverage products throughout the United States as well as internationally.  PBG's business in domestic business is divided into seven business units.  The Southeast Business Unit (SEBU) consists of North and South Carolina, Georgia, Florida, Tennessee, and part of Kentucky. (Marshall Aff. at ¶ 6).  The SEBU is broken up into eight market units, including the Carolina

4

Market Unit, which has facilities located throughout it, including Charleston, Jedburg, and Columbia, South Carolina. (Marshall Aff. at ¶¶ 6). Plaintiff Wesley Smith started working for PBG on March 22, 1999, as a warehouse employee at the Charleston, South Carolina PBG facility. On June 2, 2003, Smith was promoted to the position of Distribution Supervisor[1] of the Jedburg, South Carolina PBG facility by Michael Fowler, the Unit Manager of the Jedburg facility. Each facility has two divisions, warehouse and sales; the facility is responsible for warehousing product, selling it to customers, and delivering it to customers within a limited geographical region. In 2003 Fowler reported to Bob Marshall, the Vice-President/General Manager of the Carolina Market Unit which is responsible for all the PBG facilities within the Carolina Market Unit. Sean Helsel was the Regional Human Resources Manager of the Carolina Market Unit. Rick Simmons and Andy Cassell were the Territory Sales Managers of the Jedburg facility and they reported to Fowler.

On August 28, 2003, Plaintiff Smith prepared a disciplinary action report against Simmons, Territory Sales Manager for the Jedburg facility. Simmons was at the same management level as Smith. According to Smith's deposition, the report stated that Simmons had failed to "close out" of a handheld computer when

---

[1] The position is also referred to as Warehouse Manager or Product Availability Manager.

5

asked and failed to deposit monies on a daily basis, Smith characterized Simmons actions as stealing and sought to have Simmons fired.  In response to Smith's complaint, PBG investigated and reported to Smith it found no problem with Simmons or the Jedburg location.

Smith deposed that he responded to PBG's investigation by conducting his own private investigation.  As part of his own investigation, Smith took from the Jedberg facility a handheld computer device and three computer disks belonging to PBG containing PBG financial information. (Pl. Dep. II p. 545-548, 555-557).  He also deposed that no one at PBG gave him permission to remove those items and that he had never told anyone at PBG he had taken the property. (Pl. Dep. p. 559, 565-566).  Smith later recanted and deposed that he had only taken the computer disks. (Pl. Dep. II p. 582-585, 608-609).

On October 7, 2003, Plaintiff Smith had an argument with Simmons over a company truck.  Smith asserts that Simmons "got in his face", that Smith walked away from Simmons because there were witnesses around, and that Smith then contacted Fowler. Smith gave a discipline action report to Fowler and Helsel and sought to have Simmons fired.  On October 14, 2003, Smith e-mailed Sean Helsel, the Regional Human Resources Manager of the Carolina Market Unit, a statement of facts regarding the argument; this statement did not include ant reference to use of

6

a racial epithet by Simmons. (Pl. depo. II p. 428-429; Pl. depo. I p. 183). Smith also deposed that he did not tell Fowler, Marshall, or Helsel that Simmons had used a racial epithet. (Pl. depo. II p. 421).

PBG investigated Smith's complaint about Simmons as presented in 2003 and reported to Smith that witnesses to the argument said it was nothing out of the ordinary. (Pl. depo. I p. 167). Smith testified what really bothered him about the confrontation with Simmons was that there were other people around instead of it being one-on-one. (Pl. Dep. I, p. 203).

Nevertheless, in his deposition on February 7, 2006, Smith said for the first time that Simmons called him "a nigger" during the argument. (Pl. Dep. I). On October 9, 2003, Smith was required to attend the first module of PBG's Interaction Skills Training program, which is a training program that all supervisors are required to take. (Pl. Dep. I p. 208). The training program required attendance one day a week until completed. (Pl. Dep. I p. 215). The training class consisted of black and white employees, as well as male and female employees. (Pl. Dep. I p. 209). Smith believed that he was sent to the training program because of his black race. (Pl. Dep. I p. 210-211, 217-218).

At the end of December, 2003, Smith received notice that he was being ordered to active military duty from January 5, 2004,

through January 5, 2005. (Pl. Dep. I).  Smith's last day at PBG
was January 2, 2004.  Smith went on active military duty, and
assertsd that he was released from active duty on November 12,
2004. (Pl. dep. I p. 280).

At the end of each year, PBG conducts performance
evaluations of its management employees. (Helsel Aff.) Smith's
evaluation was performed by Fowler and approved by Helsel and
Marshall.  It was completed on February 20, 2004, and reflects
that Smith had not performed  up to PBG's expectations.  This
evaluation was not provided to Smith since he was on military
duty.

When Smith returned from military service he was informed
that his position had been filled by Erik Mizell.  Smith
contacted the Employer Support of the Guard and Reserve (ESGR) on
December 30, 2004, and made claims against PBG.  On January 2,
2005, ESGR representative Rusty Grudlic called Smith to discuss
his claims against PBG.  Thereafter, on January 10, 2005, Smith
was re-employed at PBG in the same position with the same
responsibilities that he held prior to deployment. (Pl. dep. I p.
313).

At PBG all Warehouse Managers including Smith are
responsible for completing a count of the warehouse inventory on
a daily basis. (Barberio Aff. at ¶ 5).  At the end of each
period, the Warehouse Manager makes an assessment of the

8

inventory. (Barberio Aff. at ¶ 5).  At the close of each quarter, a "hard count" is performed in which the Warehouse Manager and the Unit Manager each execute a manual count of the inventory. (Barberio Aff. at ¶ 6).  After performing the count, the Warehouse Manager and the Unit Manager compare numbers and eliminate any discrepancies between their numbers. (Barberio Aff. at ¶ 6).  These numbers are then entered into the computer system and checked against records relating to inventory. (Barberio Aff. at ¶ 6).  Variances between the count numbers and the system records must be investigated and reconciled. (Barberio Aff. at ¶ 6).

On February 20, 2005, a hard count of the Jedburg warehouse showed an inventory shortage of 3,273 cases of Pepsi product. (Barberio Aff.).  Steve Barberio, the unit manager of the Jedburg warehouse, reviewed the hard count paperwork, and saw that on January 24 and 26, 2005, someone had entered 400 cases of the 15-count, 8-ounce Mountain Dew and 452 cases of the 15-count, 8-ounce Pepsi into the computer system as "warehouse breakage", the code used when product has been removed from inventory after it has been damaged in some manner.  When Smith was questioned about the breakage, Smith said that he had directed that the cases be physically thrown away and that he had keyed that into the system. (Barberio Aff.).

9

An investigation of the inventory shortage was undertaken and PBG concluded that it was impossible for Smith to have thrown out 852 cases of that particular product because the Jedburg location had only received 657 cases of 15-count, 8-ounce Pepsi and 455 cases of 15-count, 8-ounce Mountain Dew and that it had sold 361 cases of Pepsi and 201 cases of Mountain Dew. Therefore, the most that could have been in inventory would have been 296 cases of Pepsi and 254 cases of Mountain Dew, which is less than the amount Smith claimed to have thrown away.  When confronted, Smith stated that he may have "miskeyed" the information into the system and that the breakage may have included 18-count and 6-count 8-ounce Pepsi and Mountain Dew from previous inventory periods.

The warehouse employees were interviewed and none saw the product or saw the product being thrown away. (Barberio aff. at ¶12).  Barberio also reviewed the invoices from the waste management company used by PBG to remove trash from the warehouse and saw that there was not enough waste picked up at the Jedburg facility for 852 cases of 8-ounce product to be thrown out during the month of January. (Barberio Aff. at ¶ 13).  As a result of this investigation, PBG concluded that Smith had misrepresented company documents, including the inventory documentation and fired him effective March 11, 2005.  Smith was given written notification of the reason he was discharged. (Pl. Dep. I p.

10

381).

Smith believes, albeit with no evidence, that Erik Mizell had made changes in the computer system at the Jedburg facility "making it appear that there was a loss" and that his ID name and password could have been deleted or suspended.

On or about May 15, 2005, Smith filed a charge of unspecified discrimination with the South Carolina Human Affairs Commission (SCHAC) and the Equal Employment Opportunity Commission (EEOC). In his charge, Smith claims that his termination was in retaliation for his discipline of white employees and for being "a strong black manager". Smith also prepared and provided to his attorney detailed notes of his experiences at PBG, including a comprehensive chronology of facts. (Pl. Dep. I, Ex. B at 120:24-121:16; Ex. 14 of Pl. Dep. I). Nowhere in these documents or in any of the documents produced by SCHAC is there an allegation that he was referred to by a racial epithet by any person at PBG. (Smitherman Aff. at ¶ 6).

On October 31, 2005, Smith contacted the U.S. Department of Labor's Veterans Employment and Training Services (DOL-VETS) and made claims that he should have been reinstated to his position at PBG earlier after he returned from military duty. PBG resolved Smith's USERRA claims by paying Smith $7000.00 in compensation for the period from November 13, 2004, to January 9,

11

2005.  Smith testified that the $7,000 payment satisfied his
USERRA reinstatement claim and that his claim was closed. (Pl.
dep. II p. 445).  The DOL-VETS agree. (Pl. Dep. II p. 445).

At all relevant times PBG had an equal opportunity in
employment policy in place with a procedure for reporting and
handling any discrimination concerns: "[e]mployees who feel they
have been subjected to conduct violating this policy should
notify local management and/or Human Resources" and that "[l]ocal
management and Human Resources will immediately investigate all
charges as confidentially as practicable while taking appropriate
action." (South Eastern Business Unit (SEBU) Handbook).

Upon being employed by PBG, Smith received the January 1994
SEBU Handbook. (Pl. Dep. I p. 75-76).  On February 14, 2002,
Smith received the April 2001 SEBU Handbook. (Pl. Dep. I p.
76-78).  In January 2003, Smith received the January 2003
SEBU Handbook. (Pl. Dep. I p. 79; Pl. Dep. II p. 455).  The first
content page of the 2003 handbook expressly states that it "is
only intended to provide general guidance to employees and does
not create a contract, express or implied." (Def. Ex. E, p. 5).
The 2003 handbook also expands upon PBG's anti-discrimination
policy by adding that harassment based on race, color, religion,
gender, age, disability, national origin, sexual orientation,
veteran status, or any other category protected by law is also
prohibited. (Def. Ex. E, p. 10).  The policy defines harassment

12

as "verbal or physical conduct that denigrates or shows hostility
or aversion to an individual because of any of the above-listed
characteristics or otherwise creates a hostile environment that
unfairly hinders or interferes with a person's performance."  The
policy continues by giving examples such as "epithets, slurs and
negative stereotyping" and "threatening, intimidating and hostile
acts."  The policy reiterates the reporting procedure and states
that "PBG also forbids retaliatory action to be taken against an
individual who, in good faith, reports a perceived violation of
this policy."  The policy states that any employee who feels
subjected to harassment must, without fear of retaliation, report
the alleged incident(s) to his or her Human Resources Manager.
Id.

     The handbook also contains a disciplinary corrective action
process which the company "may utilize some form of" if company
rules are violated. (Def. Ex. E, p. 47).  "The corrective action
process will generally be as follows: 1st Offense: Documented
Verbal Warning[;] 2nd Offense: Written Warning[;] 3rd Offense:
Final Warning and 1-Day Suspension[;] 4th Offense: Termination."
Id.(emphasis in original).  As part of the general conduct rules,
the handbook sets out examples of conduct that are considered
terminable offense and, as such, the corrective action process
will not be followed. Id. at 48.  Included in the list of
terminable offenses is the "[m]isrepresentation of facts or

13

falsification of Company documents including, but not limited to,
time cards, invoices, deposit slips, settlement records,
productions records and quality records." Id.  The rules conclude
by stating that "[i]t is impossible to list all of the rules and
regulations that may be necessary to operate our business safely
and effectively" and, "[t]herefore, the rules listed cannot and
do not cover every possible standard of conduct." Id.

Smith also received a supervisory guidebook.

FACTS CONCERNING DEFENDANT'S COUNTERCLAIMS

After PBG dismissed Smith's allegations against Rick Simmons
discussed supra, Smith, began conducting his own investigation
into the alleged theft without the approval or knowledge of the
company management. (Pl. Dep. I p. 145-147, 149; Pl. Dep. II, p.
594-595).  In his deposition on September 21, 2006, Smith
testified that, as part of his investigation, he took a device
and computer disks. (Pl. Dep. II p. 546-547, 562-563).  Smith
explained that he took three computer disks from the Jedburg
facility that were "sitting on the handheld indicator where the
handhelds are." (Pl. Dep. II p. 548).  Smith contended that the
computer disks contained "financial transactions." (Pl. Dep. II
p. 547).  Smith further explained that the device he took was a
"handheld device." (Pl. Dep. II p. 555-556).  Smith testified
that as of the date of his deposition, the handheld device and
the disks were at his mother's house. (Pl. Dep. II p. 556-557).

14

Smith testified that no one at PBG gave him permission to remove those items, and he never told anyone at PBG that he took the items. (Pl. Dep. II p. 556, 559, 565, 566).

Nonetheless, Smith changed his deposition testimony and stated that he did not take the handheld device and that he only took two computer disks. (Pl. Dep. II p. 582, 583, 584-585). Smith then explained that he went to the handheld devices that were mounted on the wall and took the computer disks out of them. (Pl. Dep. II p. 585-589).

On October 10, 2006, the PBG Jedburg facility received a telephone call from someone who identified himself as "George." (Steve Barberio Aff. Exhibit DD to def. Supplemental motion ¶ 4). George stated that Smith had left a pricing gun and a stack of papers with George's wife before Smith went to active duty. (Id.). George indicated that he would call the facility back later in the day to discuss the matter further, but no such call was received. (Id.).

In a hearing before the court on October 19, 2006, Smith produced three computer disks which he admitted belonged to PBG. (Ex. AA at 23, 31). Smith represented to the court that the disks were put in his shoe, boxed up and sent to his house by PBG personnel. (Ex. AA at 22). However, a few minutes later, Smith admitted to taking the computer disks. (Ex. AA at 35). Smith also stated that he had left the disks at his mother's house

15

prior to bringing them to the courthouse. (Ex. AA at 19).
Directly after this hearing, PBG's attorneys attempted to
determine what information was contained on the disks produced by
Smith and but discovered that the magnetic medium which stores
data on the floppy disks had been removed and that it was
therefore impossible to determine what had been on the disks.
(Ex. CC at ¶¶ 6-7).

Thereafter, PBG deposed Smith's mother to determine what
actually happened with the computer disks and handheld device as
Smith had previously testified that he had left these items at
his mother's house.  Smith's mother testified that Smith had
never left anything at her house at any time. (Florence Bland
Smith Bennett Dep. Ex. EE, at 20).  She further testified that
she had never seen anything that looked like a computer disk or a
handheld computer. (Ex. EE at 19, 20).  Smith's mother was asked
whether she knew anyone named George, and she deposed that she
needed a last name to determine whether she knew him. (Ex. EE p.
21).

Smith's reply to PBG's Counterclaims was due on or before
November 6, 2006.  On November 7, 2006, PBG sent Smith a letter
through certified and first class mail informing him that he was
in default and that, unless he filed his reply by November 20,
2006, PBG intended to proceed with a request for entry of default
judgment against him. (Ex. GG).  On December 7, 2006, PBG filed a

16

motion for default against Smith, which Smith received on December 20, 2006. (Certified Mail Receipt, Ex. HH).  To date, Smith has not replied to PBG's Counterclaims even though he has filed other documents with the Court.

## LAW AND DISCUSSION

RACIAL DISCRIMINATION UNDER TITLE VII, SCHAC

Title VII was fashioned "'to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identified group of white employees over other employees... .'"  Albemarle Paper Co. v. Moody, 422 U.S. 405, 417, 95 S.Ct. 2362 (1975) (quoting Griggs v. Duke Power Co., 401 U.S. 424, 429-30, 91 S.Ct. 849 (1971)).  Title VII now makes it unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

Under the disparate treatment scenario of employment discrimination, as here, a plaintiff must demonstrate that the "employer ... treats some people less favorably than others because of their ... [race] ... ." International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15 (1977).

Recently the Fourth Circuit reiterated that there are two avenues of proof by which an aggrieved employee can prove a

17

disparate treatment Title VII violation.  Brinkley v. Harbour
Recreation Club, 180 F.3d 598 at 606-607 (4th Cir. 1999).  First,
an employee may utilize "ordinary principles of proof using any
direct or indirect evidence relevant to and sufficiently
probative of the issue."  Tuck v. Henkel Corp., 973 F.2d 371, 374
(4th Cir. 1992).  To overcome a summary judgment motion based
upon this method of proof, the plaintiff "must produce direct
evidence of a stated purpose to discriminate and/or [indirect]
evidence of sufficient probative force to reflect a genuine issue
of material fact."  Goldberg v. Green & Co., 836 F.2d 845, 848
(4th Cir. 1988).  "What is required is evidence of conduct or
statements that both reflect directly the alleged discriminatory
attitude and that bear directly on the contested employment
decision."  Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995).
Plaintiff has not produced any direct evidence.

When such evidence is lacking, the plaintiff may
nevertheless proceed under the McDonnell Douglas burden shifting
proof scheme. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93
S.Ct. 1817 (1973); see, Tuck, 973 F.2d at 374.

The McDonnell Douglas standard allocates the burdens of
proof.  Texas Dept. of Community Affairs v. Burdine, 450 U.S.
248, 252-53, 101 S.Ct. 1089, 1093-94 (1981).  Under this
standard, the plaintiff bears the initial burden of proving by a
preponderance of the evidence a prima facie case of unlawful

18

discrimination: that he belongs to a minority, that he was performing his work at a level which met his employer's reasonable expectations, and that he suffered an adverse employment action under circumstances which could indicate race was not treated neutrally.

This is not a difficult case. Here, Plaintiff cannot establish a prima facie case of race discrimination because he cannot establish that he was performing his work at a level which met his employer's reasonable expectations. Even if he could establish the performance element of the prima facie case, he cannot rebut PBG's legitimate nondiscriminatory reason for firing him. The only evidence is that it was entirely reasonable for PBG to believe he was not properly doing his job and that he deserved to be fired. PBG knew of the very significant inventory shortage and that the plaintiff, the warehouse manager, had no reasonable verifiable explanation for the shortage. At the same time, there was evidence in direct contradiction to the Plaintiff's story in the form of inventory records, the fact that no warehouse employee saw or knew of hundreds of cases of product being trashed as damaged, and waste disposal company records showing it was impossible that so much product had been trashed because it was somehow damaged, as Plaintiff claimed. Defendant is entitled to judgment as a matter of law on Plaintiff's claim that he was fired because of illegal racial animus.

19

Next, Smith's <u>pro se</u> affidavit and amended affidavit may indicate that he believes that he suffered an adverse employment action when he was required to attend the diversity training. However, Smith testified that his diversity training consisted of blacks, whites, males and females and that he did not have any knowledge of anyone else having to do less training than he did. (Pl. Dep. I p. 209, 217). It is undisputed that all managers were required to attend the diversity training attended by Smith. (Helsel Aff. ¶ 5). Under these facts, it is clear that no adverse employment action took place and that Plaintiff was not treated differently because of illegal racial animus.

Additionally, if Plaintiff is trying to claim that he was subjected to a hostile work environment because a coworker on one occasion only called him a single racial epithet, that claim fails for several reasons. First, Plaintiff must show that the alleged racial harassment is sufficiently severe and pervasive to alter the conditions of employment and create an abusive atmosphere. <u>White v. BFI Waste Servs., LLC</u>, 375 F.3d 288, 297 (4th Cir. 2004). To be sure the alleged epithet is intolerable in the American workplace, but Plaintiff's allegations of only the "mere utterance of an . . . epithet which engenders offensive feelings in an employee [that] does not sufficiently affect the conditions of employment to implicate Title VII." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993). Plaintiff failed

20

to allege or show actionable harassment.

Second, even if there had been actionable harassment, an employer is not liable for Title VII harassment where: (a) "the employer exercised reasonable care to prevent and correct promptly any... harassing behavior, and (b) ... the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

Here PBG had in place an anti-harassment policy and an adequate complaint procedure which Plaintiff admittedly without reason chose not to use. As such, PBG is entitled to take advantage of the safe harbor from liability established by Ellerth and Faragher.

In sum, Plaintiff is not entitled to relief on any of his race discrimination claims.

                              USERRA

The Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4311, et seq. ("USERRA") "provides a multi-tiered and 'comprehensive remedial scheme to ensure the employment and reemployment rights of those called upon to serve in the armed forces of the United States.'" Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 303 (4th Cir. 2006)(citing

                                21

Morris-Hayes v. Bd. of Educ., 423 F.3d 153, 160 (2d Cir. 2005)).
Section 4312 states that "any person whose absence from a
position of employment is necessary by reason of service in the
uniformed services shall be entitled to the reemployment rights
and benefits of [USERRA]." 38 U.S.C. § 4312. Section 4316 states
in relevant part that "a person who is reemployed by an employer
under USERRA shall not be discharged from such employment, except
for cause" within one year if the period of service was for 181
days or more. 38 U.S.C. § 4316(c).

Section 4316(c) temporarily changes the at-will employment
status of returning veterans and, for a certain period of time,
an employer cannot discharge a returning veteran except for
cause. Francis, 452 F.3d at 308. "In a discharge action based
on conduct, the employer bears the burden of proving that it is
reasonable to discharge the employee for the conduct in question,
and that he or she had notice, which was expressed or can be
fairly implied, that the conduct would constitute cause for
discharge." 20 C.F.R. § 1002.248(a) (2006).

In Francis, the employer provided evidence of plaintiff's
misconduct, including arriving late to work and leaving early
without permission, missing scheduled conference calls, acting
inappropriately to customers and co-workers (engendering
complaints about her behavior and professional attitude from the
latter), and leaving her work station without permission. Id.

22

The employer also provided proof that the plaintiff had notice
that her misconduct was cause for discharge by establishing that
she had been given a notice of probation which indicated that she
"should understand fully that [her] failure to immediately
address [her] issues would result in termination of [her]
employment." Id. at 408-09.  In response, Plaintiff Francis
submitted her own affidavit which stated that she believed she
was acting professionally and in accordance with the employer's
expectations.  Id. at 408.  The court found that "[t]he operative
legal question not whether [the plaintiff] believed that she was
acting professionally. The operative legal question is whether,
based on the undisputed evidence in the record, it was
objectively reasonable for [the defendant] to dismiss [the
plaintiff]."  Id.  The court held that the pattern of misconduct
evidenced by the defendant provided sufficient legal basis to
justify the plaintiff's dismissal despite Plaintiff's subjective
views of her actions and affirmed the district court's granting
of summary judgment to the defendant.

    In the instant action, Plaintiff Smith claims that Defendant
fired him without cause within the applicable one year period.
Plaintiff is wrong.  PBG has established Plaintiff was
responsible for a significant inventory discrepancy, that he gave
demonstrably false information about it, that his hypothesis for
the discrepancies is without any factual support, and that PBG

23

discharged him with ample cause for it.  Smith had notice that
the misrepresentation of company inventory documents was cause
for discharge because it was part of the handbook he admitted to
receiving and he attached the applicable page to his complaint.
Smith admitted he has no evidence to support his belief that his
military participation had anything to do with his termination,
that he did not know of anyone at PBG who had an anti-military
bias. (Pl. Dep. II p. 449-450).  As such, Smith has no evidence
that would raise a question of fact regarding this issue, and the
defendant is entitled to summary judgment.

### BREACH OF CONTRACT AND BREACH OF THE IMPLIED CONTRACT OF GOOD FAITH AND FAIR DEALING

South Carolina courts have long recognized the doctrine of
employment at-will.  See, e.g., Shealy v. Fowler, 188 S.E. 499
(S.C. 1936).  Under this doctrine, which is the general rule in
South Carolina, an employer may discharge an employee for good
reason, bad reason, or no reason at all without incurring
liability.  Culler v. Blue Ridge Elec. Coop., Inc., 422 S.E.2d
91, 91 (S.C. 1992); Ludwick v. This Minute of Carolina, Inc., 337
S.E.2d 213, 214 (S.C. 1985).

However, in his amended affidavit, Petitioner alleges that
he "was issued a Policy and procedures guidebook a code of
Conduct and employee handbook that has altered the terms of that
of an at will employee." (Pl. Amended Aff. ¶ 16).  Yet in his
deposition, he admitted that he did not have an employment

24

contract with PBG that altered his employment-at-will status. (Pl. Dep. I p. 94-95). He further deposed that he was not relying on any of Defendant's handbooks or the supervisory guidebook to support any claim in this lawsuit. (Pl. Dep. I p. 94).  A plaintiff cannot submit an affidavit that contradicts his own prior sworn testimony and create a genuine material fact question to preclude summary judgment.  See, e.g., Cothran v. Brown, 357 S.C. 210 (2004).  The plaintiff cannot rely on his own contradictory statements to provide evidence to support a claim for a breach of contract.  Further, as a result, he cannot obtain relief on the derivative claim of breach of the implied covenant of good faith and fair dealing.

EMPLOYEE RETIREMENT INCOME SECURITY ACT

In addition, Plaintiff seeks the recovery[2] of any lost employee benefits, pursuant to the Employee Retirement Income Security Act (ERISA) of 1974, caused by his alleged wrongful termination.  "ERISA comprehensively regulates ... employee welfare benefit plans that ... provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability, or death." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 44 (1987), abrogated in part other grounds by, Kentucky Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329, 341-42 (2003).

---

[2] It does not appear that Plaintiff brought a cause of action under ERISA, but rather prayed for any damages which he might be entitled to under ERISA.

Since Plaintiff's claims under ERISA are contingent on a finding of wrongful termination under USERRA, Title VII, or a breach of contract, and PBG has established there are no genuine issues of material fact regarding those causes of action, Plaintiff's ERISA claim fails as a matter of law as well.

CLAIMS NOT PLED IN THE COMPLAINT

In his voluminous motion filings, Smith makes reference to and contends that he is entitled to relief for a plethora of reasons not contained in his complaint, including, but not limited to breach of trust, defamation, intentional infliction of emotional distress, constitutional claims, "blackballed," conspiracy, and "Post Employment actions caused by Defendants." These claims were not included in the plaintiff's complaint and are not properly before the court.

DEFENDANT'S CONVERSION COUNTERCLAIM

To recover for its counterclaim for conversion, PBG must show:  (1) an interest by PBG in the thing converted; (2) that Smith converted the property to his own use; and (3) the use was without PBG's permission.  Mullins v. Trident Emergency Physicians, 313 S.C. 70 (App. Ct. 2002).  Smith's own sworn testimony establishes each of these elements.  He testified that he took a handheld device and computer disks that belonged to PBG from the Jedberg warehouse without permission.  He testified that he took the items home in order to continue his personal

26

investigation of the alleged theft.  Therefore, since the

Plaintiff's own testimony establishes all the elements necessary

for conversion, PBG is entitled summary judgment on its liability

claim because Plaintiff cannot now introduce evidence to

controvert his own sworn testimony.  The issue of damages on this

claim remains open for further proceedings.

ABUSE OF PROCESS

In it's counterclaim for abuse of process, PBG pled:

> In 2003, while employed by PBG, Plaintiff took
> from PBG's facility a handheld computer and three
> scan disks used therewith without permission and
> without notifying anyone at PBG. These items
> belonged to PBG and it used them in its regular
> course of business.  Plaintiff removed the items
> from Jedburg facility for his own use and has
> wrongfully retained them. During his deposition,
> Plaintiff perjured himself by changing his
> testimony and claiming he did not in fact take a
> handheld computer device from the Jedburg
> facility.  Plaintiff did this with the improper
> intent of subverting PBG's defenses in order to
> obtain the payment of money from PBG in fraudulent
> settlement or by fraudulent judgment on his
> claims.  PBG has been additionally injured by
> Plaintiff's actions and has incurred costs and
> legal expenses attempting to discover the truth of
> the matter and defending this action despite the
> fact Plaintiff would have been discharged from
> employment in 2003.  PBG is informed and believes
> that it is entitled to recover from Plaintiff  for
> its actual damages and losses, including
> attorneys' fees, and that it is entitled to
> recover punitive damages from the Plaintiff in an
> amount to be determined by the jury.

The abuse of process tort provides a remedy for one damaged

by another's perversion of a legal procedure for a purpose not

intended by the procedure.  See, Huggins v. Winn-Dixie

27

Greenville, Inc., 249 S.C. 206, 210, 153 S.E.2d 693, 695 (1967)
("[A]n abuse of process is the employment of legal process for
some purpose other than that which it was intended by the law to
effect-the improper use of a regularly issued process."); W. Page
Keeton et al., Prosser and Keeton on the Law of Torts § 121 at
897 (5th ed. 1984) ("[T]he gist of the tort is ... misusing, or
misapplying process justified in itself for an end other than
that which it was designed to accomplish."). The purpose itself,
though ulterior, need not be illegitimate; rather, the abuse
occurs when the purpose is accomplished by using the process in a
manner in which it was not intended to be used. See, Fowler W.
Harper et al., The Law of Torts § 4.9 (3d ed.1996).

In order to prevail on its claims for abuse of process, PBG
must show two essential elements: (1) an ulterior purpose; and
(2) a willful act in the use of process not proper in the conduct
of the proceeding. Food Lion, Inc. v. United Food & Commercial
Workers International Union, 351 S.C. 65, 71 (App. Ct. 2002). "An
ulterior purpose exists if the process is used to gain an
objective not legitimate in the use of the process." Id. (citing
First Union Mortgage Corp. v. Thomas, 317 S.C. 63, 74, 451 S.E.2d
907, 914 (Ct. App.1994). As to the willful act element, the
South Carolina Supreme Court stated "[s]ome definite act ... not
authorized by the process or aimed at an object not legitimate in
the use of the process is required." Hainer v. Am. Med. Int'l,

Inc., 328 S.C. 128, 136, 492 S.E.2d 103, 136 (1997).

PBG asserts that Plaintiff engaged in abuse of process by suing the defendant in the first instance. That assertion is incorrect. There is no evidence that the plaintiff had an ulterior motive and a purpose collateral to the suit itself; there is no evidence that Plaintiff is using the suit for other than its stated purpose, i.e., to seek redress for his termination. Food Lion, Inc. v. United Food & Commercial Workers International Union, 351 S.C. 65, 71 (App. Ct. 2002). PBG's counterclaim for abuse of process is dismissed.

FRAUD UPON THE COURT

The defendant seeks judgment as a matter of law on its counterclaim denominated "fraud upon the court"in which it pled:

> In 2003, while employed by PBG, Plaintiff took from PBG's facility a handheld computer and three scan disks used therewith without permission and without notifying anyone at PBG. These items belonged to PBG and it used them in its regular course of business. Plaintiff removed the items from Jedburg facility for his own use and has wrongfully retained them. Plaintiff represented in his deposition that he did not take a handheld computer from PBG. Plaintiff knew that this representation was false and made the representation with the intent of having PBG not discover the truth of his actions and be able to assert its full defenses and claims against Plaintiff and to miss its opportunity to engage in discovery regarding the handheld.
> PBG was ignorant of the representations falsity and relied upon it by failing to engage in discovery regarding the handheld prior to the discovery deadline. PBG had the right to rely upon the statement as it was made under oath during Plaintiff's deposition. PBG has been injured as a

29

> result of Plaintiff's fraud including, but not
> limited to, incurring costs and legal expenses in
> attempting to uncover the truth of the matter and
> defending this action despite the fact Plaintiff
> would have been discharged from employment in
> 2003.  PBG is informed and believes that it is
> entitled to recover from Plaintiff for its actual
> damages and losses, including attorneys' fees, and
> that it is entitled to recover punitive damages
> from the Plaintiff in an amount to be determined
> by the jury.

Fraud upon the court has been defined as "that species of fraud which does, or attempts to, subvert the integrity of the Court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." Evans v. Gunter, 294 S.C. 525, 529 (App. Ct. 1988)(citing H. Lightsey, J. Flanagan, South Carolina Civil Procedure, 408 (2d ed. 1985)).  It is some intentional act or conduct by which the prevailing party has prevented the unsuccessful party from having a fair submission of the controversy.  Id.

PBG cannot prevail on this claim as it is not "the unsuccessful party" and Plaintiff is not "the prevailing party." PBG does not seek to overturn a federal civil judgment[3] but is

---

[3] If it were seeking to overturn a judgment a losing party would normally proceed in one of three ways.  That party can file a motion under Fed.R.Civ.P. 60(b)(3) for relief on the ground of fraud, misrepresentation or other misconduct.  The aggrieved party also can seek to set aside the judgment on the narrower theory that it was obtained by "fraud on the court." Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88

30

attempting to bring an independent claim for money damages for Plaintiff's perjury and spoilation of evidence. Each of the cases plaintiff cites in support of its argument is an action seeking to vacate a judgment. None involves independent claims for damages. Neither has plaintiff directed the court to any authority that would allow for an independent claim at law. The cases it cites in support of its claim merely state the elements normally applicable to those claims. None of the cited cases suggests that perjury and spoilation of evidence may be applied in the special arena of fraud on a court or to support a claim for damages. Fraud on the court cases are generally decided under Fed. R. Civ. P. 60 and related doctrines that might result in the granting of a new trial, or relating to the court's discretion to allow comment to a jury on the destruction of evidence, see, Vodusek v. Bayliner Marine Corp., 71 F.3d 148 (4th Cir. 1995). Chewning v. Ford Motor Co., 35 F.Supp. 2d 487 (D.S.C. 1998).

Here, where PBG has not suffered a judgment caused by the prevailing party's perjury or spoilation of evidence or other fraudulent acts, fraud on the court is not a viable tort theory and that counterclaim will be dismissed.

L.Ed. 1250 (1944). Finally the party that wishes to challenge the judgment can pursue an independent action in equity. Great Coastal Express, Inc., v. Int'l Brotherhood of Teamsters, 675 F.2d 1349, 1357-58 (4th Cir. 1982), cert. denied, 459 U.S. 1128, 103 S.Ct. 764 (1983) .

## CONCLUSION

Accordingly for the aforementioned reasons, the defendant's motion for summary judgment is granted as to the plaintiff's claims of racial discrimination in violation of Title VII, breach of contract, breach of the covenant of good faith and fair dealing, and violation of USERRA and ERISA. The defendant's motion for summary judgment on the counterclaim for conversion against Smith is granted. The defendant's counterclaims for abuse of process and fraud upon the court are dismissed. All other outstanding motions are denied as moot.

**IT IS SO ORDERED.**

ROBERT S. CARR
UNITED STATES MAGISTRATE JUDGE

Charleston, South Carolina

August **31**, 2007

32

## _NOTICE OF RIGHT TO APPEAL_

The parties have the right to appeal this Order within thirty (30) days from the date hereof, pursuant to Rules 3 and 4(a)(1)(B) of the Federal Rules of Appellate Procedure. Failure to meet this deadline, as modified by Rule 4 of the Federal Rules of Appellate Procedure, will waive the right to appeal. The Federal Courts Improvement Act of 1996 amended 28 United States Code Section 636 to provide that appeals from civil cases tried by Magistrate Judges with consent of the parties be heard only in the United States Courts of Appeals.